M. B. PURVIS *v.* Web HUBBELL, Mayor and Agent for Service for the City of Little Rock, Arkansas et al

80-315                                         620 S.W. 2d 282

Supreme Court of Arkansas
Opinion delivered July 13, 1981
[Rehearing denied September 21, 1981.]

*Harkey, Walmsley & Belew*, by: *M. B. Purvis*, for appellant.

*Jack R. Magruder, III*, City Atty., for City of Little Rock.

*Owens, McHaney & Calhoun*, for Little Rock Advertising & Promotion Commission.

*Hoover, Jacobs & Storey*, for Little Rock Center Associates, Ltd.

FRANK HOLT, Justice. This litigation arises from the proposed construction of a convention center-hotel complex in Little Rock and the issuance of approximately $27,375,000 of revenue bonds by the city to finance its share of the cost. Appellant, a taxpayer, brought this action for a declaratory judgment, challenging the legality of the project. The chancellor denied the petition, finding that the appellant had failed to show the actions of the appellees, Board of Directors of the City of Little Rock and the Little Rock Advertising and Promotion Commission, were unauthorized by law or unlawful or that they acted arbitrarily, unreasonably and oppressively; that the Board and the Commission acted with due diligence and deliberation with respect to the convention center project and in the public interest; that the appellant failed to show fraud or gross abuse of discretion by either the Board or the Commission; that the development of the convention center is in the public interest and is pursuant to Act 380 of the Acts of Arkansas of 1971, as amended; that the proposed bonds are not general obligations of the city and the full faith and credit of the city was not pledged for repayment of these bonds; that they are tourism revenue bonds within the meaning and intent of Act 380; and that Act 380 authorizes the city to do what it proposes. In summary, the repayment of the bonds is to be made out of the income or assets of this special project for which the debt is incurred and, therefore, Act 380 does not contravene Art. 12, § 4 (as amended by Amendment 10), Art. 16, § 1 (as amended by Amendment 13), nor Amendment 49, Art. 16; § 13, and Art. 12, § 5.

Appellant first asserts for reversal that "[t]he totality of circumstances under which benefits are derived by and payments of money made to and on behalf of the promoters renders the proposed convention center in violation of Article 16, section 1 of the Arkansas Constitution." Appellant argues that the contract between the parties shows a

substantial deprivation of the money and property of appellant and people of Little Rock, and that the financial aid has been used for the advancement of private enterprise and for the benefit of the promoters as developers of the project.

Art. 16, § 1 of the Constitution of 1874, as amended by Amendment 13, in pertinent part, provides: "No municipality shall ever grant financial aid toward the construction of . . . private enterprises operated by any person, firm or corporation . . ." The project, owned by the city, is to be financed by bonds, without an election, issued pursuant to the popularly known "Tourism Act." Act 380 of the Acts of Arkansas of 1971, as amended. Ark. Stat. Ann. § 13-1801 et seq. (Repl. 1979). Payment of the bonds would be solely from five sources: (1) revenues derived by the city from a tax of 2% upon gross receipts from hotel, motel, restaurant and other on-premises food consumption establishments as authorized by Act 185 of 1965 (Ark. Stat. Ann. § 19-4613 [Repl. 1980]), (2) revenues received by the city from the existing and new convention centers, (3) revenues received by the city from the parking facilities in conjunction with the center, (4) rent paid to the city by the developers, and (5) "state turnback revenues" which represent a pro rata or a partial turnback of state income and sales tax proceeds that are estimated to be generated by or derived from the proposed tourism project or convention center facilities as authorized by the provisions of Act 763 of the Acts of Arkansas of 1977, as amended. (Ark. Stat. Ann. § 19-5501 et seq. [Repl. 1980]).

The proposed center is to be constructed on the site formerly occupied by the Grady Manning and Marion Hotels. The proposal is that the promoters, Little Rock Center Associates, Ltd., would sell their land to the city for the amount they paid for it with interest from the date of their purchase to the date of purchase by the city. The city would build the convention center, and the promoters would build a 16 story-460 room hotel on top of the center at their expense, title to be in the city, with the promoters having the right or option to lease the hotel, together with shops and restaurants, for 53 years with the option to renew for two successive terms or a total of 103 years at a specified

Base and Participation Rental. Furthermore, a restrictive convenant involving adjacent lands owned by the city provides that the promoters must agree to any proposed use of such lands before they can be so used. The promoters would receive a total of $200,000 for services rendered to date and not to exceed $200,000 for future services in the supervision of construction of the center and hotel. The city would pay the contractors chosen by the promoters a fee of $589,157 for supervising construction. Other expenses and savings were allocated between the parties, with the further provision that the promoters would contribute $3,000,000 toward the construction of the center in addition to the costs assumed by them as enumerated above. The promoters have the right to proceeds from the sale of salvage from the hotels formerly on the site, the city bearing the cost of the demolition.

In *Williams* v. *Harris, Mayor*, 215 Ark. 928, 224 S.W. 2d 9 (1949), we held this provision, Art. 16, § 1, as amended by Amendment 13, was violated where, from the language of the ordinance, it could be inferred that a manufacturer, rather than the city itself, might be or become the owner of the factory being built to which the city was contributing from the proceeds of the bonds. This is not true here. Another example where we have found a violation, as asserted here, is *Halbert* v. *Helena-West Helena Industrial Development Corporation*, 226 Ark. 620, 291 S.W. 2d 802 (1956), in which the municipality had purchased a membership in a corporation. This was found to be granting financial aid. In *Wayland* v. *Snapp*, 232 Ark. 57, 334 S.W. 2d 633 (1960), however, we held Art. 16, § 1, as amended by Amendment 13, was not violated even though a private corporation, as a lessee, might derive some benefit from an industrial plant, financed by a bond issue, since any benefit to it would be "merely incidental" and the "main benefits" would inure to the public. Title to the manufacturing facility would be in the city.

Here, as indicated, the promoters are building the hotel at their own expense, as well as substantially contributing to the costs of the convention center with title to the hotel, as well as the convention center, being vested in and to remain in the city. The promoters are to pay the city annual Base & Participation Rentals which the city deems reasonable. In

the circumstances, the construction of this city owned project by the issuance of these revenue bonds is not violative of Art. 16, § 1, as amended, of our state constitution as asserted by appellant.

Appellant also argues that the city has exercised poor judgment in its negotiations resulting in a disadvantageous contract between the parties. We agree with the chancellor when he said:

> The wisdom of governmental projects, such as the one now before the Court, is not a proper subject of judicial inquiry. Rather, the judicial problems in such matters center upon the questions of whether the project is legally authorized and lawfully programmed.

Further, the testimony adduced by the city that the contract is reasonable is uncontroverted. Whether the contract is improvident addresses itself to the wisdom of the appropriate city officials. See *Miles* v. *Gordon*, 234 Ark. 525, 353 S.W. 2d 157 (1962).

Appellant next contends that an election to approve the bonds is required by Act 380 of 1971, as amended, inasmuch as it implements Amendment 49 of our Arkansas Constitution (1874), which requires an election. Appellant further asserts that the act is unconstitutional in that it allows a term of a bond issue to be 40 years at 10% interest whereas Amendment 49 only allows a term of 30 years at 6%. Amendment 49 to the Constitution provides that "[a]ny city of the first or second class, any incorporated town, and any county, may issue, by and with the consent of the majority of the qualified electors of said municipality or county voting on the question at an election held for the purpose, bonds in sums approved by such majority at such election for the purpose of securing and developing industry within or near the said municipality holding the election, or within the county holding the election." Act 380 makes tourism an industry within the meaning of Amendment 49. Ark. Stat. Ann. § 13-1801 (Repl. 1979).

Amendment 49 obviously is an extention of Art. 16, as amended by Amendment 13, to provide for industrial

development. In *Snodgrass* v. *Pocahontas*, 189 Ark. 819, 75 S.W. 2d 223 (1934), this court found no violation of Amendment 13 (to Art. 16) where bonds, issued without election, were to be paid from revenue generated by the improvements to the waterworks system for which the bonds were issued. The court said:

> Constitutional provisions should receive a reasonable construction, the purpose being to ascertain the meaning of the framers of the provision of the Constitution, and the intention of the electors in adopting the provision. It was manifestly the intention of the framers of Amendment 13 to prohibit cities and towns from issuing interest-bearing evidence of indebtedness, to pay which the people would be taxed, or their property appropriated to pay the indebtedness, or any indebtedness that placed any burden on the taxpayers. It was not the intention to prohibit cities and towns from making improvements and pledging the revenue from the improvements so made alone to the payment of the indebtedness.

In *McArthur* v. *Smallwood*, 225 Ark. 328, 281 S.W. 2d 428 (1955), this court had before it an alleged violation of Amendment 20, which Amendment concerns the state issuing bonds pursuant to an election, whereas Amendment 49 is concerned with issuance of bonds by cities, towns and counties with electoral consent. Ths court there noted that the bonds, issued without approval at an election, were to be repaid by revenue producing sources consisting of state agency rentals, the proceeds from the sale of a state owned building, and enumerated costs levied and collected by courts and certain state agencies, all of which the legislature authorized as special funds for repayment of the bonds. We held that the bondholders could look only to those sources of revenue or special funds provided for repayment and that no claim could be asserted against the state should those sources prove insufficient. Therefore, issuance of the bonds, without election approval, was not violative of Amendment 20 nor Art. 16, § 1, as amended by Amendment 13.

Ark. Stat. Ann. § 13-1805 (Repl. 1979) specifically

provides that tourism revenue bonds, as here, are not general obligations of the city, they are special obligations; in no event shall they constitute an indebtedness of the city "within the meaning of any constitutional or statutory limitation" and the bonds must "plainly" so state. In the circumstances, we find no violation, as asserted, of Amendment 49. It follows that since these bonds do not arise under that Amendment, there is no constitutional violation in the increase of the interest rate from 6% to 10% and the term of such bonds from 30 years to 40 years.

Even so, appellant argues the fact that the funds would be derived from the 2% sales tax upon gross receipts or gross proceeds from hotel, motel, restaurant and other on-premises food consumption establishments within the city, from the parking facilities and from the state turnback revenues emanating from this project "should have alerted the chancellor the proposal was illegal." We find no merit in this contention. The revenues from the parking facilities are revenues generated by the project itself. The other two sources are authorized by statute specifically and solely for such purposes. The 2% sales tax is authorized by Act 185 of 1965, Ark. Stat. Ann. § 19-4613 (Repl. 1980). Section 19-4615 provides all such sums collected shall be credited to a specific purpose or fund; i.e., to the city advertising and promotion fund, created by the ordinance levying the tax. Section 19-4617 then provides these funds shall be used for certain enumerated purposes concerned with the promotion of the city or the construction, maintenance, repair, etc. of convention centers in that city and facilities necessary to such a center or for payments relating to bonds as authorized in the Act, issued in connection with convention center projects. Subsection (B)(3) of § 19-4617 provides these bonds shall not be general obligations of the city but special obligations, secured and payable as provided in this section. Act 763 of 1977, as amended, § 19-5501 et seq. authorizes the pledging of turnback revenues. Under it the repayment of bonds issued for the construction of such a facility, as here, may be made from funds which are deemed attributable to the increased State Sales Tax revenues and State Income Tax revenues generated by the eligible facilities. § 19-5504 (g). This act defines "Revenue Bonds" as those issued which are

limited or special rather than general obligations of the issuer and which are not payable from the proceeds of an ad valorem tax. § 19-5503 (j).

In *McArthur* v. *Smallwood, supra*, the court held the state, by issuing revenue bonds for the construction of the Justice Building, was not pledging its credit, that the pledging of state or public revenues is not prohibited by Amendment 20, requiring approval by election, as long as they are not obligations of the state. "The bondholders can look only to those sources of revenue made available by the act, and if they are insufficient, no claim of any nature can be asserted against the State" and ". . . the irrevocable pledging of state funds is condemned only when they are pledged to full faith and credit obligations of the State." The court noted the funds were not available for general or other purposes and were designated as special funds. Therefore, no approval by the election process was necessary. To the same effect see also *Miles* v. *Gordon*, 234 Ark. 525, 353 S.W. 2d 157 (1962), where we upheld the validity of an act authorizing certificates of indebtedness, payable from special funds, issued by the State Reserve Fund Commission for financing construction of facilities at state supported colleges. Further, *Holmes* v. *Cheney*, 234 Ark. 503, 352 S.W. 2d 943 (1962), where we approved the validity of an act which authorized the issuance of bonds by the State Revenue Commission, without electoral consent, for the construction of a new state revenue building with the bonds being payable from fees collected from motor vehicle certificates of title and the recording of mineral leases.

In summary, the bonds, here, are clearly not general obligation bonds of the city. They are revenue bonds, payable, as authorized by the legislature, from special funds not available for general purposes. The purchasers of the bonds must look solely to these funds for payment. Neither the appellant, as a taxpayer, nor the city can ever be required to pay any part of them upon a default as a result of the insufficiency of these funds. We agree with the chancellor that there is no violation of the asserted constitutional provisions.

After carefully considering our previous decisions, it appears there has been a gradual expansion of the concept of revenue producing bonds, which require no popular approval, as was authorized for instance in *Snodgrass* v. *Pocahontas*, 189 Ark. 819, 75 S.W. 2d 223 (1934). However, a change should not be made retroactively, after public agencies and investors have relied on our decisions; but in other instances we have given notice that an interpretation of the Constitution may or will be changed. *Clubb* v. *State*, 230 Ark. 688, 326 S.W. 2d 816 (1959); *Hare* v. *General Contract Purchase Corp.*, 220 Ark. 601, 249 S.W. 2d 973 (1952). Accordingly, we give notice of our intention to prospectively reconsider our cases at the next opportunity after the present opinion becomes final.

Affirmed.

ADKISSON, C.J., and HICKMAN and PURTLE, JJ., dissent.

RICHARD B. ADKISSON, Chief Justice, dissenting. This is an appeal from a Pulaski Chancery Court Decree upholding a Little Rock City Ordinance authorizing the issuance of revenue bonds pursuant to Act 380 of 1971, as amended (Ark. Stat. Ann. § 13-1801 et seq.). Act 380 states that "this Act, and the authorities conferred hereby are in implementation of [Arkansas Constitutional] Amendment No. 49 and necessary for the full accomplishment of the public purposes contemplated by the people in adopting that Amendment."

Amendment 49 was voted upon and approved by the electorate in the general election of November, 1958. It is composed of six sections and approximately *800 words* and provides for the issuance of bonds by a vote of the affected electorate at a maximum interest rate and for a specific number of years. Section 3 of the Amendment provides for the retirement of the bonds and was construed in *Wayland* v. *Snapp*, 232 Ark. 57, 334 S.W. 2d 633 (1960) as allowing the retirement of the bonds by either a general obligation tax or by special obligation revenues. It is noted that, of the six sections contained in Amendment 49, three expressly provide for an election to be held for the purpose of *issuing* bonds. Section 4 limits their maturity to a period of thirty

(30) years. And, Section 2 sets a maximum interest rate of six percent (6%) per annum and provides for a public sale.

The majority is holding that in passing Amendment 49 the people voted on only *eight words* authorizing a bond issue "for the purpose of securing and developing industry." In arriving at this conclusion they rely on cases construing Amendments 13 and 20 which hold that an election is not necessary for the issuance of bonds to be retired by special revenues as opposed to the general obligations of the governmental unit. *Snodgrass* v. *Pocahontas*, 189 Ark. 819, 75 S.W. 2d 223 (1934);*McArthur* v.*Smallwood*, 225 Ark. 328, 281 S.W. 2d 428 (1955). These cases were decided prior to Amendment 49 and did not intend to forever foreclose the people from requiring an election before the issuance of bonds to be paid for by taxes. Yet, this Court is so holding today contrary to the clearly expressed and unequivocal wording of Amendment 49.

There is no question that, under the terms of the Trust Indenture, this bonded indebtedness obligates not only the citizens of the City of Little Rock but also those of the entire state. Under state statutes the following revenue sources have been pledged for repayment of these proposed bonds: a 2% hotel, motel, and restaurant sales tax within the boundaries of the Issuer; revenues derived from the parking facilities financed from the proceeds of bonds being refunded; and state turnback revenues derived from State income and sales tax. This trust indenture constitutes a contract between the bondholders and the city, and no subsequent laws may impair its obligations; therefore, it is clear that the taxpayers' moneys, both state and local, will be committed for a number of years under this agreement. *See Jones* v. *Cheney*, 253 Ark. 926, 489 S.W. 2d 785 (1973).

The appellees have expressly urged this Court to hold that the only effect of Amendment 49 is to authorize bond issues "for the purpose of securing and developing industry." Regardless of prior constructions given by this Court to Amendments 13 and 20, the people must retain the right to require a vote of the electorate before issuance of bonded indebtedness. This right was adopted under

Amendment 49 is unmistakable language, and to hold that this constitutional right is nonexistent is to fail to uphold the Constitution of the State. The people of this State will certainly be surprised to discover that the six sections of Amendment 49 providing for prior election before the issuance of bonded indebtedness, the setting of the interest rate and the maturity date, and the manner of sale of such bonds are superfluous and that, in effect, they voted only on eight words authorizing bond issues "for the purpose of securing and developing industry."

For the reasons stated, I would reverse.

I am hereby authorized to state that PURTLE, J., joins me in this dissent.

DARRELL HICKMAN, Justice, dissenting. The majority's decision is a bad precedent for two reasons. First, the bonds in this case are not pure revenue bonds. The money that will be used by the city to pay off the bonds will not consist wholly of revenue produced by the project, but will also consist of money taken from the regular income of the City of Little Rock. Little Rock receives turnback money from the State of Arkansas which is the city's portion of the state income and sales tax. An unknown amount of that money will be used annually hereafter to pay these bonds. Act 763 of 1977 is the vehicle being used to circumvent the constitutional prohibition against bonds issued without a vote by the people. Ark. Const. art. 16, amend. XIII. If Act 763 is allowed to stand then any part of the general income of a city, county, or state can be used to pay bonds not approved by the public. That is a dangerous as well as illegal practice. The pretext used in this case is tourism. Exactly what tourism is and exactly how much money will be set aside from the turnback funds to pay the bonds is unknown and really any such designation has to be arbitrary and speculative.

The second reason the decision is a bad precedent is that it violates Article 16, Section 1 of the Arkansas Constitution, as amended by Amendment 13. Amendment 13 reads:

. . . No municipality *shall ever* grant financial aid

toward the construction of railroads or other private enterprises operated by any person, firm or corporation, and no money raised under the provisions of this amendment by taxation or by sale of bonds for a specific purpose shall ever be used for any other or different purpose. . . . [Emphasis added.]

The majority holds that no aid has been granted to a private developer in this case because the city owns the property. The title to the complex is vested in the City of Little Rock with the developer granted a 103 year lease. The fact that the city holds bare legal title is used as an excuse for finding that the project is city owned and, therefore, the constitution is not violated. The city in this case will pay up to $400,000 to the private developer for his services. The contractor will be paid a fee of nearly $600,000. The developer will receive a lease for 103 years, which no doubt exceeds the useful life of this project. The substance of this deal between the city and the developer is that the city will finance the project and the developer will operate it for its useful life. If this is not a case of a city granting financial aid to a private enterprise then none can ever exist.

Arkansas's constitution is drafted so that the state, cities, and counties will remain solvent. The people of this state decided that the future income of this state would not be pledged without the voter's consent at the polls. Numerous efforts to avoid these constituitonal provisions have been made and many of them have been successful. For example, the building in which this court is housed is financed by so-called revenue bonds that are really state bonds. To be specific, the money that is used to pay the bonds on the Justice Building comes in part from appropriations made to state agencies as rent. One of those appropriations was for the Public Service Commission. When the Public Service Commission moved from this building, the Court of Appeals was allowed money, called rent, which is paid to the bondholders. In other words, the General Assembly is appropriating money every two years to pay these bonds off. In *McArthur* v. *Smallwood*, 225 Ark. 328, 281 S.W. 2d 428 (1955), a special court approved the bond issue for the Justice Building and closed its eyes to the realities of the situation.

That has been the pattern generally followed by this court regarding attempts to evade the constitution.

Even so, the case before us presents a far more dangerous precedent that those set in the past. Now a part of the general revenue of the cities, counties, or state can be directly set aside to pay bonds which have not been approved by the voters. There will be no pretext of "rent." Now city governments can openly, blatantly, and baldly enter into an agreement with a private developer in contravention of the Arkansas Constitution.

The fact that the complex contemplated in this case would be good for the City of Little Rock or even the State of Arkansas is wholly irrelevant. So is the fact its construction has begun. Any legal question should have been resolved long before now. That was a responsibility of the city officials and private interests.

The people trust this court to enforce the constitution. Our record in regard to the enforcement of Amendment 13 is poor.