IN RE ADOPTION OF Andrew William REEVES, A Minor

91-358                                      831 S.W.2d 607

Supreme Court of Arkansas
Opinion delivered May 18, 1992

*The Strother Firm, P.A.*, by: *Judith C. Strother*, for appellant.

*Johnson, Sanders & Morgan*, by: *Roger L. Morgan*, for appellee.

TOM GLAZE, Justice. This is an appeal of the probate court's denial of Tom Watson's petition to set aside the adoption of minor, Andrew Reeves, by Todd Reeves. Andrew's mother, Lynne Watson, and Tom Watson were married for two years, and had one child, Dustin. The Watsons divorced in 1985, but during a reconciliation attempt, Lynn became pregnant. Andrew was born, but the couple had never remarried. Andrew used Watson as his last name. Although Tom Watson was not named as the father on the child's birth certificate, both Lynne and Tom acknowledged that he was the father.

Todd Reeves married Lynne on November 28, 1988, and one year later, petitioned the court to allow Todd to adopt Andrew. In the petition, Todd and Lynne swore that the natural father of the child was unknown. On November 2, 1989, the probate judge entered a final order allowing Todd to adopt Andrew. Tom learned of the adoption, and on February 25, 1991, filed his petition to set aside the court's order of adoption. Tom's petition alleged that (1) he was the father of Andrew, (2) he had significant contacts with Andrew since birth, and (3) he had not received notice of the adoption proceedings. While the trial court found that Tom had established a substantial relationship with

the child, it held that Tom was not entitled to notice of the adoption proceeding under Ark. Code Ann. § 9-9-212 (Repl. 1991) or, because he was not registered in the state's putative father registry, under Act 496 of 1989 (codified as Ark. Code Ann. §§ 9-9-207, -210, -224 and §§ 20-18-701 to -705 (Repl. 1991)).

Tom raises three issues why the probate court erred in refusing to set aside the adoption decree, but the crucial issue to be decided is whether the probate court erred in finding Tom was not entitled to notice because he had failed to register with Arkansas's putative father registry. We affirm the trial court's decision.

Tom's argument largely rests upon his belief that the trial court misinterpreted the Supreme Court's decision in *Lehr* v. *Robertson*, 463 U.S. 248 (1983). He argues the trial court wrongfully determined that, under the rationale of *Lehr*, Tom was not entitled to notice of Andrew's adoption proceedings even though Tom had established a significant relationship with his son, Andrew. We do not read the trial court's holding so narrowly.

The *Lehr* case involved New York's statutory scheme which protected the unmarried father's interest in assuming a responsible role in the future of his child. New York's legislature enacted a law that automatically provided notice to seven categories of putative fathers that the legislature believed would include fathers who likely would have assumed some responsibility for the care of their natural children.[1] Under the law, putative fathers

---

[1] Persons entitled to notice under the New York law included the following:

(a)  any person adjudicated by a court in this state to be the father of the child;

(b)  any person adjudicated by a court of another state or territory of the United States to be the father of the child, when a certified copy of the court order has been filed with the putative father registry, pursuant to section three hundred seventy-two-c of the social services law;

(c)  any person who has timely filed an unrevoked notice of intent to claim paternity of the child, pursuant to section three hundred seventy-two of the social services law;

(d)  any person who is recorded on the child's birth certificate as the child's father;

(e)  any person who is openly living with the child and the child's mother at the time the proceeding is initiated and who is holding himself out to be the child's

could guarantee they could receive notice of any adoption proceedings regarding their children if they merely registered with New York's putative father registry.

The father in *Lehr* did not fit within any of New York's seven categories, nor did he otherwise show that he had established a significant relationship with his son. After reviewing the cases of *Stanley* v. *Illinois*, 405 U.S. 645 (1972); *Quilloin* v. *Walcott*, 434 U.S. 246 (1978); *Caban* v. *Mohammed*, 441 U.S. 380 (1979); and *Smith* v. *Organization of Foster Families for Equality and Reform*, 431 U.S. 816 (1977), the *Lehr* court concluded as follows:

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to this opinion of where the child's best interests lie.

The court in *Lehr* concluded that New York's statutory scheme had adequately protected the putative father's constitutional right or opportunity to develop a relationship with his offspring. The court further held that the possibility the father may have failed to register because of his ignorance of the law was not a sufficient reason for criticizing the law itself.

Tom is correct in arguing that the Court in *Lehr* did not assess the constitutional adequacy of New York's procedures for terminating a developed relationship. As already discussed, the

---

father;

    (f)   any person who has been identified as the child's father by the mother is written, sworn statement; and

    (g)   any person who was married to the child's mother within six months subsequent to the birth of the child and prior to the execution of a surrender instrument or the initiation of a proceeding pursuant to section three hundred eighty-four-b of the social services law.

463 U. S. at 251-2.

father in *Lehr* did not fall within any of the categories that purportedly presumed some responsibility on his part towards his child; nor did he show he had developed any such responsible relationship.

■ In the present case, the trial court determined Tom had established a significant relationship with Andrew because he had visited with Andrew on the same occasions he exercised visitation rights with his older son, Dustin.[2] Because Tom developed this relationship, he argues he was entitled to notice of Andrew's pending adoption proceeding even though he had failed to comply with Arkansas's putative father registry law. In making this argument, Tom does not question, below or in this appeal, the constitutional adequacy of Arkansas's registry law, Act 496 of 1989, as it pertains to terminating a developed relationship.[3]

■ Arkansas law allows any man, who is not legally presumed or adjudicated to be the biological father of a child, but who claims or is alleged to be the father of the child, the right to file with the state's putative father registry. *See* §§ 20-18-701, -702. Upon filing, the father is entitled to a copy of any adoption; petition filed naming or involving his child. § 9-9-224(a). Under these provisions, and the facts of this case as determined by the trial judge, Tom clearly would have been entitled to notice of Todd Reeves' petition to adopt Andrew, if Tom had complied with Arkansas's registry law.

In sum, while Tom argues the trial court's decision violated his due process rights because it deprived him of notice of the pending adoption of Andrew, Arkansas law, in fact, provided notice to Tom in these circumstances. Of course, whether Arkansas's notice requirement is constitutionally sufficient is, like in *Lehr*, not raised here.

---

[2] Tom neither financially supported Andrew nor attempted to legitimate him. Tom did offer to marry Lynne, but she refused.

[3] We note Tom Watson's pleadings never raised the constitutionality of Act 496 of 1989 or other adoption statutes, and nothing in the record reflects such arguments were otherwise raised. At pages 61 through 76 of the record, the trial court made general reference to a statute (presumably § 9-9-224) not requiring notice to Tom Watson in the circumstances of this case, but such statute and the sufficiency or adequacy of notice it provides putative fathers was never mentioned.

■  Also relevant but not constitutionally challenged here is Ark. Code Ann. §§ 9-9-206(a)(2) and 9-9-207(b) (Repl. 1991). These statutory provisions basically require the consent to adoption of fathers who have legally legitimated their relationship with their children, and those fathers, as well as the ones who have filed with the state's putative father registry, are entitled to notice of a hearing on any petition seeking the adoption of their children. Of course, fathers who have legitimate children are automatically entitled to notice of such a hearing, and putative fathers must register to receive notice. But, again, Act 496 and the adequacy of its notice provisions has not been constitutionally questioned, and these provisions have a presumption of constitutionality. *Wells* v. *Clinton*, 282 Ark. 20, 666 S.W.2d 684 (1984). If and when these adoption provisions are challenged, the attorney general is required notice under most circumstances. *See Olmstead* v. *Logan*, 298 Ark. 421, 768 S.W.2d 26 (1989). Because Arkansas's existing statutory scheme does provide notice to putative fathers who have registered, we affirm the trial court's decision denying Tom's request to set aside Andrew's adoption decree.

■■  Tom Watson makes two other arguments for setting aside the adoption decree, *viz.*, (1) the mother committed perjury by falsely swearing in the petition for adoption that the natural father was unknown and (2) the adoption was not in the best interest of the child. Our resolution of the notice issue disposes of these remaining issues. As was pointed out by the trial court, Tom failed to comply with Arkansas's registry law so as to trigger its notice provisions. As a consequence, he was not entitled to notice regardless of the improper actions of Andrew's mother. By our holding, we certainly do not condone her actions and merely state that sanctions are available when a party or witness offers perjured testimony. As to the issue pertaining to the child's best interest, Tom Watson simply has no standing to raise it under the circumstances of this case.

For the reasons stated above, we affirm.

HOLT, C.J., and BROWN, J., dissent.

ROBERT L. BROWN, Justice, dissenting. I respectfully dissent.

The chancellor here found that Tom Watson had developed a significant personal relationship with his son, Andrew Reeves. Moreover, the natural mother, Lynn Watson, while acknowledging that Andrew was Tom Watson's child, swore as part of the adoption petition filed with her new husband that the natural father was unknown. Knowing that the child was Tom Watson's, she purposely did not notify him of the adoption. Under these circumstances I would hold that Watson's due process rights were violated.

The majority states that the Putative Father Registry Act satisfies notice requirements. It further concludes that if a putative father fails to register, he is not entitled to notice of an adoption, regardless of his personal relationship with his son or the mother's calculated acts to deny him notice. That cannot be the law.

The Putative Father Registry Act certainly provides a procedural mechanism for notifying putative fathers. I cannot agree, however, that it provides an *exclusive* means for notice or that failure to register deprives a putative father of his right to notice under these circumstances.

Notice in addition to that afforded by Arkansas' Putative Father Registry Act is guaranteed by the due process clauses of the state and federal constitutions when the father has developed a significant personal relationship with the son. The U.S. Supreme Court has stated in this vein:

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," *Caban*, 441 US, at 392, 60 L.Ed.2d 297, 99 S.Ct. 1760 his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children." *Id.*, at 389, n 7, 60 L.Ed.2d 297, 99 S.Ct. 1760. But the mere existence of a biological link does not merit equivalent constitutional protection.

*Lehr* v. *Robertson*, 463 U.S. 248, 261 (1983). In *Lehr*, that relationship between father and son was lacking. Here, the significant personal relationship is given, and the chancery court

so found.

But since Watson does not attack the Putative Father Registry Act on constitutional grounds, the majority is reluctant to delve into whether Watson had due process rights in addition to the statutory rights. The focus, however, should not be on whether a constitutional question relating to the statute was raised, but on whether Watson was entitled to notice in this case as part of procedural due process. I believe that he was. Any other conclusion violates fundamental fairness.

The fact that the natural mother attempted to thwart notice to Watson enhances this position. Under the majority opinion, a putative father could have the best of relationships with his son but fail to register. Then when the natural mother hides the fact of an adoption from him, he has no recourse.

I would reverse.

HOLT, C.J., joins.